UNITED STATES of America

v.

José LOPEZ, Appellant.

No. 90–3020.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 29, 1990.

Decided June 28, 1991.

Stephen C. Leckar (appointed by this court), with whom G. Allen Dale, was on the brief, Washington, D.C., for appellant.

James A. Meade, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Asst. U.S. Atty., were on the briefs, Washington, D.C., for appellee. Philip S. Kushner, Asst. U.S. Atty., was also on the supplemental brief, Washington, D.C., for appellee.

A.J. Kramer, Federal Public Defender, Washington, D.C., was on the amicus curiae brief on behalf of appellant.

Stuart M. Gerson, Asst. Atty. Gen., Dept. of Justice, and John R. Steer, General Counsel, and Donald A. Purdy, Jr., Chief Deputy General Counsel, U.S. Sentencing Com'n, Washington, D.C., were on the amicus curiae brief for U.S. Sentencing Com'n.

Before BUCKLEY, WILLIAMS and THOMAS, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Appellant Clarence Morales, who was charged under the name of José Lopez, received a sentence of fifty-one months in prison and three years of supervised release after he pled guilty to conspiring to distribute cocaine. Morales challenges the district court's refusal to depart from the sentence prescribed by the Federal Sentencing Guidelines in consideration of his age and personal background. The district court correctly understood the Guidelines to limit departures on the basis of age to extraordinary circumstances, and it acted within its discretion when it determined that Morales's youth did not warrant a departure. In declining to mitigate the sentence on the basis of his background, the court concluded that because the Guidelines foreclosed consideration of a defendant's socio-economic status, it had no discretion to depart on the basis of Morales's particular history. Because the court mischaracterized certain elements of that history as "socio-economic," we set aside the sentence and remand for resentencing.

## I. BACKGROUND

### A. Regulatory Background

Congress enacted the Sentencing Reform Act of 1984 ("Act") to assure greater uniformity in sentencing by federal judges. The Act established the United States Sentencing Commission and gave it the mandate, *inter alia*, to determine whether certain factors, including the age of a defendant, "have any relevance to the nature ... of an appropriate sentence." 28 U.S.C. § 994(d) (1988). The Act also directed the Commission to assure that its "guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders." *Id.* Pursuant to these instructions, the Commission included the following provisions in part H of its *Guidelines Manual* that deal with "Specific Offender Characteristics":

§ 5H1.1. *Age* (Policy Statement)

Age is *not ordinarily relevant* in determining whether a sentence should be outside the guidelines. Neither is it ordinarily relevant in determining the type of sentence to be imposed when the guidelines provide sentencing options. Age may be a reason to go below the guidelines when the offender is elderly and infirm and where a form of punishment (*e.g.*, home confinement) might be equally efficient as and less costly than incarceration.

. . . . .

§ 5H1.10. *Race, Sex, National Origin, Creed, Religion, and Socio–Economic Status* (Policy Statement)

These factors are *not relevant* in the determination of a sentence.

United States Sentencing Commission, *Guidelines Manual*, ch. 5, pt. H (1990) (emphasis added; original emphasis removed).

The Guidelines permit a sentencing court to depart from the sentence derived from an application of the Guidelines to the facts of a particular case—that is to say, to increase or decrease the indicated sentence—where

the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission ... that should result in a sentence different from that described."

*Id.* § 5K2.0 (policy statement) (quoting 18 U.S.C. § 3553(b)).

## B. Factual Background

On May 25, 1989, Morales and two other men were arrested by the Washington, D.C., police for possession of cocaine and weapons. Morales subsequently pled guilty to conspiracy to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846.

At his January 1990 sentencing hearing, Morales requested downward departures from the prescribed sentence on three grounds. He argued, first, that application of the Guidelines led to a significant overstatement of his criminal history; second, that his youth warranted a downward departure; and third, that his particular history justified additional consideration. In support of his arguments, Morales submitted a personal statement and letters from family members. These submissions, together with the presentence report, provide the following information about his background and personal experiences.

After his father left the family when Morales was a small child, his grandmother and mother raised him in Brooklyn, New York. When he was thirteen or fourteen, he was sent to Puerto Rico to live with his father. Family tensions and his inability to read and write Spanish caused him to return to his mother the following year. On arriving back in Brooklyn, he learned that she had remarried. At his stepfather's demand, Morales was sent to a home for juveniles. When he was fifteen and still at the home, Morales stole a bicycle to visit his sister. He was arrested and convicted of the offense. His grandmother then arranged for him to live with her in Brooklyn. Soon thereafter, his mother died from injuries sustained in falling from a roof. Morales and his family believe that she had been thrown from the roof by her husband,

who was never prosecuted. After his stepfather threatened to kill him, Morales moved to Arlington, Virginia, where he lived with relatives and worked at a service station. He became involved in the drug trade in the spring of 1989. At the time of his arrest, Morales was eighteen years old.

The district judge granted the first request for a departure and reduced the criminal history category from level two to level one. The judge held that the level prescribed by Federal Sentencing Guidelines section 4A1.3 significantly overstated the gravity of his criminal history, which consisted of his conviction for bicycle theft when he was fifteen. The judge, however, denied the request to depart downward on the basis of defendant's youth and family history. The court recognized Morales's youth and the "tragic circumstances" of his life, but stated:

> The Court's going to deny the request for this reason: It feels the guidelines do not give it any discretion, even using the term "ordinarily," based upon the guideline comments under that, saying there should be rare departures or departures should be considered very unusual. I recognize other district judges have taken the opportunity to depart on somewhat similar circumstances, but the guidelines were passed to provide uniformity in sentencing as one of their goals.
>
> . . . .
>
> In any event, the Court feels that it [referring to Morales's age] is not such an unusual case as may be provided for by the wor[d] "ordinarily" in the guideline referred to earlier as that would permit the Court to depart. The circuits have pretty well established, I believe, that socioeconomic standing or background of the ... defendant can make no difference to the Court. That was taken into account by the guidelines themselves. That being the case, the Court will deny the request to depart further downward.

Transcript of Sentencing Hearing, Jan. 17, 1990 ("Tr."), at 21–23. Morales appealed from the court's refusal to depart down-

ward on the basis of age and background, and challenged section 5H1.1 of the Guidelines on the basis that the Sentencing Commission had failed to explain why a defendant's youth should not ordinarily be taken into account by the sentencing court.

After oral argument, we directed the parties to file supplemental briefs addressing two questions:

(1) May a court set aside an applicable sentencing guideline because it was promulgated without a sufficient "statement of basis and purpose"? *See* 5 U.S.C. § 553(c); 28 U.S.C. § 994(x)....

(2) Is an individual's exposure to domestic violence and its attendant dislocations a constituent of "socio-economic status," and thus not relevant in the determination of a sentence under section 5H1.10 of the Sentencing Guidelines?

We also invited the United States Sentencing Commission to address these questions as *amicus curiae*.

## II. DISCUSSION

■ This court may review a refusal to depart downward from a range prescribed by the Guidelines only if the district court imposes a sentence in violation of law or incorrectly applies the Guidelines. *See* 18 U.S.C. § 3742(a) (1988); *United States v. Ortez*, 902 F.2d 61, 63 (D.C.Cir.1990). A sentencing court's decision not to depart is reviewable if based on a misconstruction of its authority to depart. *See, e.g., United States v. Baskin*, 886 F.2d 383, 389–90 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990).

■ In the case before us, the court understood the scope of its authority on the question of age. Section 5H1.1 of the *Guidelines Manual* declares that age is "not ordinarily relevant in determining whether a sentence should be outside the guidelines," and courts have accordingly shown a reluctance to depart on the basis of age, *see, e.g., United States v. Carey*, 895 F.2d 318, 324 (7th Cir.1990); *United States v. Summers*, 893 F.2d 63, 68–69 (4th Cir.1990). The qualifier "ordinarily," how-

ever, does permit a court to consider this factor in an extraordinary case. *See United States v. Shoupe*, 929 F.2d 116, 120 (3d Cir.1991); *United States v. Brand*, 907 F.2d 31, 33 (4th Cir.) (considering section 5H1.6), *cert. denied*, —— U.S. ——, 111 S.Ct. 585, 112 L.Ed.2d 590 (1990); *see also Guidelines Manual* § 5K2.0 (allowing such departures where "in light of unusual circumstances, the guideline level attached to that factor is inadequate"). Here the court correctly understood that the Guidelines gave it authority to depart in unusual circumstances, but concluded that this defendant did not present them. Morales points to a departure granted in another case by the same judge in sentencing a defendant of the same age to suggest that the court abused its discretion here. Contrary to Morales's assertion, the grant of a departure in a case with some similarities to his own gives him no basis to attack the court's exercise of its discretion in his own case. Even among codefendants, disparities in sentencing generally are not reviewable. *See, e.g., United States v. Perez*, 904 F.2d 142, 147 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 270, 112 L.Ed.2d 226 (1990).

■ Morales argues that the Guidelines, in restricting consideration of age, violate due process. Every other circuit has held that the restrictions imposed by the Guidelines on a sentencing judge's discretion do not infringe a defendant's right to due process under the Fifth Amendment. *See United States v. Brady*, 895 F.2d 538, 539–40 (9th Cir.1990), and cases cited therein. For the reasons given in *Brady, see id.* at 543–44, we conclude that the Guidelines' treatment of age did not violate Morales's due process rights.

Morales also claims that section 5H1.1 is invalid because the Sentencing Commission failed in its duty to give reasons for its declaration that age is not ordinarily relevant. This duty, he argues, springs from "well-settled administrative law principles imported into the sentencing context by *Mistretta v. United States*," Brief for Appellant at 24 (citing *Mistretta*, 488 U.S. 361, 109 S.Ct. 647, 665–67, 102 L.Ed.2d 714

(1989)). In *Mistretta* (which concerned a separation-of-powers challenge to the Guidelines), the Supreme Court noted that the Sentencing Commission was directly accountable to Congress, as Congress had reserved the authority to revoke or amend any of the Guidelines within the six-month waiting period provided for in section 235(a)(1)(B)(ii)(III) of the Act, 98 Stat. 2032. *Id.* 109 S.Ct. at 666. The Court also observed that section 994(x) made the Commission's rulemaking subject to the Administrative Procedure Act's notice and comment requirements. *Id.*

■ Contrary to Morales's suggestion, however, the "well-settled administrative law principles" are of limited application to this case. Section 994(x) reads as follows:

The provisions of section 553 of Title 5, relating to publication in the Federal Register and public hearing procedure, shall apply to the promulgation of guidelines pursuant to this section.

28 U.S.C. § 994(x). Applying the principle of *inclusio unius est exclusio alterius,* we conclude that by subjecting the promulgation of the Guidelines to this one section of the APA, Congress affirmed that the Commission's rulemaking was not subject to any other provision of the APA, including those for judicial review. This conclusion is confirmed by the Senate Committee Report:

[Section 994(x)] is an exception to the general inapplicability of the Administrative Procedure Act ... to the judicial branch.

. . . .

It is ... not intended that the guidelines be subject to appellate review under chapter 7 of title 5. There is ample provision for review of the guidelines by the Congress and the public; no additional review of the guidelines as a whole is either necessary or desirable.

S.Rep. No. 225, 98th Cong., 1st Sess. 180–81 (1983), U.S.Code Cong. & Admin.News 1984, pp. 3182, 3363, 3364 (footnote omitted). We thus conclude that this court lacks authority to review the adequacy of the Commission's statement of reasons in support of its conclusion that age is not ordinarily relevant to sentencing.

Morales's second challenge addresses the district court's refusal to depart from the Guidelines sentence on the basis of Morales's personal background. The transcript reflects the court's understanding that section 5H1.10 forbids consideration of an offenders' socio-economic status as a basis for departure. It also reveals that the court read that term too broadly.

■ In promulgating section 5H1.10, the Commission followed the congressional command to "assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders." 28 U.S.C. § 994(d). The Senate Committee Report explained that section 994(d) would counter any suggestion "that it might be appropriate, for example, to afford preferential treatment to defendants of a particular race or religion or level of affluence, or to relegate to prisons defendants who are poor [and] uneducated." S.Rep. No. 225 at 171, U.S.Code Cong. & Admin.News 1984, p. 3354. Thus the phrase "socio-economic status" refers to an individual's status in society as determined by objective criteria such as education, income, and employment; it does not refer to the particulars of an individual life. "The idea here is roughly that ... whether one is worse off or better off, privileged or underprivileged, rich or poor, should not be relevant in determining one's sentence." *United States v. Barone,* 913 F.2d 46, 52 (2d Cir. 1990) (Feinberg, J., concurring in part and dissenting in part); *see id.* at 52–53 (questioning whether section 5H1.10 forecloses upward departure based on betrayal of community confidence by a lawyer and former public servant).

While the sentencing judge correctly found that section 5H1.10 precluded departure from the Guidelines sentence on the basis of Morales's socio-economic status, the judge appears to have given that term too broad a scope. Thus, in discussing the request for a downward departure based on Morales's deprived background, the

judge observed that although he was greatly concerned by

> the tragic circumstances that make up what we call the socioeconomic class, that is, the death of his mother by his stepfather murdering her, his own threats, that he had to leave town to avoid problems, his growing up in the slum areas of New York and of Puerto Rico and not fitting in because of his ... dual background....

Tr. at 21, he concluded that as "the circuits have pretty well established ... that socio-economic standing or background ... of the defendant can make no difference to the Court," *id.* at 22–23, the request for a departure must be denied.

 It is undoubtedly true that individuals in certain social strata are apt to be exposed to far more violence and human ugliness than those who enjoy more privileged lives, but the court erred in concluding that all the experiences he described as "tragic" fell within the rubric of "socio-economic status." Part H of the *Guidelines Manual* is concerned with "specific offender characteristics." The characteristics listed in section 5H1.10, namely race, sex, national origin, creed, religion, and socio-economic status, are all objective; they reflect the kind of data that might be found in a census taker's checklist. They do not take cognizance of the traumatic experiences to which offenders of whatever characteristics might have been exposed. Violence among family members and its attendant dislocations do not follow class lines, nor should class lines determine whether a sentencing judge may consider them.

The government concedes that exposure to domestic violence is not a constituent of socio-economic status, but nevertheless maintains that it does not constitute a basis for departure. The government urges that a focus on particular life experiences would permit every defendant to distinguish himself from all others and thus would undermine the purpose of the Guidelines; instead, a court must focus upon the impact, not the details, of a given experience. The appropriate consideration, in this view, is the impact of Morales's particular experiences on his mental and emotional condition.

We do not reach the question whether exposure to domestic violence may only be considered under the provisions of the Guidelines for mental and emotional conditions, or whether a judge confronted with circumstances of the sort presented here has discretion to determine whether they are "of a kind ... not adequately taken into consideration by the Sentencing Commission that should result in a sentence different from that described." 18 U.S.C. § 3553(b); *see Guidelines Manual* § 5K2.0 (policy statement regarding grounds for departure). *See also United States v. Deigert*, 916 F.2d 916, 918–19 (4th Cir.1990) (remanding for resentencing where the transcript did not make clear whether the sentencing judge understood that he had discretion to depart downward in an extraordinary case for "tragic personal background and family history"). Nor do we decide whether, as the government urges, the characterization of such conditions as "not ordinarily relevant in determining whether [to depart], except as provided in the general provisions of Chapter Five," *Guidelines Manual*, § 5H1.3, limits departures to those express exceptions, or whether, in extraordinary circumstances, it provides a district court with a general authority to depart. *Cf. United States v. Vela*, 927 F.2d 197, 199 (5th Cir.1991); *United States v. Russell*, 917 F.2d 512, 517 (11th Cir.1990). Because the district court rested its action on the premise that section 5H1.10 entirely foreclosed consideration of exposure to domestic violence, we must give it the opportunity to reconsider Morales's sentence.

III. CONCLUSION

In refusing to depart on the basis of Morales's age, the district court committed no error. Nor can this court review the Sentencing Guidelines' provisions on the ground of the Commission's failure to state their basis and purpose. Because the district court defined "socio-economic status" too broadly, however, it incorrectly con-

cluded that section 5H1.10 left it no discretion to consider the defendant's special circumstances. In order to permit the district court to determine whether those circumstances warrant or permit departure, the sentence is

*Set aside and remanded.*