# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 5, 2023          Decided June 7, 2024

No. 23-5067

MEDICAL IMAGING & TECHNOLOGY ALLIANCE AND
ADVANCED MEDICAL TECHNOLOGY ASSOCIATION,
APPELLANTS

v.

LIBRARY OF CONGRESS AND CARLA HAYDEN, IN HER OFFICIAL
CAPACITY AS LIBRARIAN OF CONGRESS,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-00499)

———

*Michael B. Kimberly* argued the cause for appellants. With him on the briefs were *Peter Tolsdorf* and *Alex C. Boota*.

*Michael Pepson* and *Ryan P. Mulvey* were on the brief for *amicus curiae* Americans for Prosperity Foundation in support of appellants.

*Michael A. Tilghman II*, *Cory L. Andrews*, *John M. Masslon II*, *David Y. Chung*, and *Elizabeth B. Dawson* were on the brief for *amici curiae* the National Association of

Manufacturers and Washington Legal Foundation in support of appellants.

*Laura E. Myron*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Daniel Tenny*, Attorney.

Before: RAO and CHILDS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

Dissenting opinion filed by *Circuit Judge* CHILDS.

RAO, *Circuit Judge*: This case raises the question of whether copyright rules promulgated under the Digital Millennium Copyright Act ("DMCA") are reviewable under the Administrative Procedure Act ("APA"). The DMCA prohibits the circumvention of technological barriers that restrict access to digital copyrighted works. The Librarian of Congress promulgated an exemption to that anti-circumvention provision, allowing some access to the software of advanced medical devices. Trade associations representing medical device manufacturers sued, claiming the exemption violated the APA. The district court held the APA claims were barred by sovereign immunity because the Library of Congress is part of "the Congress" and therefore not an "agency" within the meaning of the APA's judicial review provision.

Irrespective of whether the Library is an "agency," however, Congress has specified that copyright regulations under Title 17 of the U.S. Code are subject to the APA. The Copyright Act of 1976 provides that "all actions" of the Register of Copyrights under Title 17—which includes rules

that must be approved by the Librarian—are governed by the APA. *See* 17 U.S.C. §§ 701(e), 702. And the DMCA authorizes the Register and Librarian to promulgate a new category of rules under Title 17. Reading the two statutes together, we conclude that DMCA rules are subject to the APA just like other copyright rules. The APA therefore provides the necessary waiver of sovereign immunity for this suit.

This interpretation treats Congress's scheme of copyright regulation as a coherent whole and accords with background principles for judicial review of administrative action. Accordingly, we reverse and remand for the district court to assess the APA claims in the first instance.

I.

A.

Although best known as the Nation's library, the Library of Congress quietly exercises significant regulatory authority over copyrights. The Library houses the U.S. Copyright Office, which is headed by the Register of Copyrights. The Copyright Act of 1976 conferred broad authority on the Register to make copyright rules and reorganized Title 17 of the U.S. Code. *See* Pub. L. No. 94-553, 90 Stat. 2541 (codified at 17 U.S.C. §§ 101 *et seq.*). The Act specified that the Register acts under the direction and supervision of the Librarian, 17 U.S.C. § 701(a), and that "[a]ll regulations established by the Register under [Title 17] are subject to the approval of the Librarian of Congress," *id.* § 702. As we have recognized, the Librarian is a "Head of Department" within the Executive Branch. *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012).

At issue in this case is a rule promulgated under the Digital Millennium Copyright Act. *See* Pub. L. No. 105-304, 112 Stat.

2860 (1998) (codified at 17 U.S.C. §§ 1201 *et seq.*). The DMCA implemented two international treaties by providing additional protections for digital copyrighted works. Digital media had been eligible for copyright protection before the DMCA, but advances in technology and the rise of the internet facilitated piracy and unlawful reproduction on an unprecedented scale. *See Green v. U.S. Dep't of Just.*, 54 F.4th 738, 741 (D.C. Cir. 2022). Although owners of digital copyrights could protect their creations through technological protective measures like passwords or encryption, these barriers could be circumvented by new technologies and devices. To address these problems, one of the treaties directed signatories to "provide adequate legal protection … against the circumvention of effective technological measures that are used by authors" to protect their works. World Intellectual Property Organization Copyright Treaty art. 11, Dec. 20, 1996, 2186 U.N.T.S. 121, 155.

To implement that directive, the DMCA created a private right of action against anyone who "circumvent[s] a technological measure that effectively controls access to a work protected under" federal copyright law. 17 U.S.C. §§ 1201(a)(1)(A), 1203(a). Congress also authorized criminal penalties for violations of section 1201 done "willfully and for purposes of commercial advantage or private financial gain." *Id.* § 1204. In effect, this anti-circumvention provision backed private technological protective measures with the force of federal law. Such protective measures, however, can also frustrate third parties from making "fair use" of copyrighted material, depriving society of innovations and other beneficial noninfringing uses. *See Green*, 54 F.4th at 742. To mitigate the potential adverse effects of the anti-circumvention provision, Congress authorized the Librarian to identify "class[es] of copyrighted works" to which the anti-circumvention provision "shall not apply." 17 U.S.C. § 1201(a)(1)(D). The Librarian

grants these exemptions in a rulemaking proceeding every three years. *Id.* § 1201(a)(1)(C).

Triennial DMCA rulemaking proceeds as follows. First, the Register makes a "recommendation" to the Librarian about whether the "users of a copyrighted work are, or are likely to be[,] … adversely affected" by the anti-circumvention provision "in their ability to make noninfringing uses … of a particular class of copyrighted works." *Id.* The Register must determine whether certain proposed uses "are or are likely to be noninfringing" under the Copyright Act and whether "the prohibition is causing, or … is likely to cause, an adverse impact on those uses." *See* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 86 Fed. Reg. 59627, 59628 (Oct. 28, 2021). The Register's adverse impact determination turns on five factors: the extent to which the copyrighted works are available for use; the availability of the works for certain nonprofit purposes; the impact of the anti-circumvention provision on paradigmatic fair uses; the effect of circumvention on the market for the copyrighted works; and additional "appropriate" considerations. *See* 17 U.S.C. § 1201(a)(1)(C)(i)–(v).

After assessing the Register's recommendation and the requisite statutory factors, the Librarian determines whether the anti-circumvention provision should be waived for a specific class of copyrighted works. *Id.* § 1201(a)(1)(C). Although the DMCA entrusts the Librarian with the ultimate decision, as a practical matter, the Register performs most of the rulemaking functions.

B.

This suit was brought by two trade associations: the Medical Imaging & Technology Alliance and the Advanced

Medical Technology Association. They represent manufacturers of advanced medical devices such as surgery assisting robots, CT scanners, and MRI machines. The manufacturers develop custom software for their devices and use technological protective measures to shield their copyrighted computer programs from unwanted access.

When the devices break down, however, the technological protections may restrict users such as hospitals and health care providers from employing their own servicemen to troubleshoot and fix the devices. Instead, users must rely on the device manufacturers' technicians for diagnostics, repairs, and maintenance. Some manufacturers provide limited software access to independent service operators so they can perform repairs. But in general, medical device manufacturers have resisted allowing third-party servicers to access their software.

In 2020, two independent service operators petitioned the Copyright Office for an exemption from the DMCA's anti-circumvention provision. They claimed the manufacturers' technological protections were blocking access to "error logs, configuration files, and other unprotected works" in addition to the copyrighted software. This prevented the independent service operators from performing diagnosis, maintenance, and repairs on medical devices, functions that were particularly critical during the COVID-19 pandemic. The independent operators also alleged that the device manufacturers were using their technological protective measures to monopolize the maintenance services market and force hospitals to pay more for licensed repairmen. The independent operators insisted their repair services were "fair use[s]" and that they should be able to lawfully access the manufacturers' software and other data files.

The Register solicited comments on an exemption that would allow independent service operators to bypass technological protective measures on medical devices for the purpose of diagnosis, modification, or repair. Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 Fed. Reg. 65293, 65307 (Oct. 15, 2020). The trade associations opposed the proposed exemption, arguing the independent service operators sought access to the device manufacturers' software for purely commercial purposes, which were not fair use. Nevertheless, in a report submitted to the Librarian, the Register recommended granting the exemption. She first concluded the independent service operators' maintenance and repair services were noninfringing "fair uses" of the copyrighted software under the relevant statutory factors. Next, the Register found the exemption was justified because, under the five DMCA factors in 17 U.S.C. § 1201(a)(1)(C), the anti-circumvention provision was causing or was likely to cause "an adverse impact on the noninfringing diagnosis, repair, and maintenance of medical devices and systems."

In the final triennial rule, the Librarian incorporated the Register's recommendation and granted the exemption, which permits the circumvention of technological protective measures on "[c]omputer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system." 37 C.F.R. § 201.40(b)(15).

## C.

The trade associations sued the Library and the Librarian, seeking declaratory and injunctive relief. They claimed the Librarian violated the APA by granting the exemption, the

Librarian acted *ultra vires*, and the Librarian's exercise of rulemaking power was unconstitutional because it was either a legislative decision rendered without bicameralism and presentment or an executive rulemaking performed by a congressional officer.

The district court granted the Library's motion to dismiss, rejecting each of the trade associations' claims. *Med. Imaging & Tech. All. v. Libr. of Cong.*, No. CV 22-499, 2023 WL 2387760, at *8–9 (D.D.C. Mar. 7, 2023). First, the court held the APA claims were barred by sovereign immunity. *Id.* at *9. The district court concluded that although the APA waives sovereign immunity for non-monetary claims against federal agencies, "the Congress" is exempt from the APA's definition of "agency," and "[t]he Library of Congress is indisputably part of Congress." *Id.* (cleaned up). The district court relied in part on earlier decisions of this court that concluded the Library was part of "the Congress" and therefore not subject to APA review. *Id.* at *10 (citing *Clark v. Libr. of Cong.*, 750 F.2d 89, 102–03 (D.C. Cir. 1984); *Ethnic Emps. of Libr. of Cong. v. Boorstin*, 751 F.2d 1405, 1416 n.15 (D.C. Cir. 1985); *Wash. Legal Found. v. U.S. Sent'g Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994)).

Second, the district court rejected the trade associations' *ultra vires* claim because the Librarian did not "plainly act[] in excess of her delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Id.* at *13 (cleaned up). And finally, the court held the DMCA rulemaking did not run afoul of the separation of powers. *Id.* at *14.

The trade associations abandon their constitutional arguments on appeal, but they maintain that DMCA rules are reviewable under the APA because the Library is an "agency"

insofar as it engages in executive rulemaking functions. In the alternative, the trade associations contend the Librarian acted *ultra vires*. We consider these legal issues and the district court's grant of the motion to dismiss *de novo. See Kim v. United States*, 632 F.3d 713, 715 (D.C. Cir. 2011).

## II.

The threshold question is whether the challenged DMCA rule is reviewable under the APA. We conclude that it is. The APA provides that "[a]gency action made reviewable by statute" is "subject to judicial review." 5 U.S.C. § 704. In the Copyright Act of 1976, Congress specified that actions under Title 17 are governed by the APA. *See* 17 U.S.C. § 701(e). DMCA rules are promulgated under Title 17. *See id.* § 1201(a)(1)(C)–(D). It follows that the trade associations may challenge the triennial rule because the APA provides the cause of action for this suit and the necessary waiver of sovereign immunity.

## A.

The parties and the district court analyzed the question of reviewability by focusing on whether the Library was part of Congress. The APA provides a cause of action and a waiver of sovereign immunity for non-monetary claims against an "agency" or "an officer … thereof," 5 U.S.C. § 702, but the APA carves out "the Congress" from the definition of "agency," *id.* § 701(b)(1)(A). Because the Library believes it is a component of "the Congress," it maintains it is not an "agency," and thus the APA's cause of action and waiver of sovereign immunity do not apply to this suit.

This framing, however, fails to account for the fact that Congress can provide for APA review of the DMCA regulations by statute, regardless of whether the Library is an

"agency." The APA provides a general framework for review of agency action, but Congress may, and often does, apply this framework to other government actions. For instance, the Sentencing Reform Act of 1984 explicitly extended provisions of the APA to the U.S. Sentencing Commission, even though the Commission was arguably not an APA "agency."[1] *See Wash. Legal Found.*, 17 F.3d at 1449–50.

In the Copyright Act, Congress provided that copyright regulations are reviewable under the APA. The Act expanded the Register's rulemaking authority and provided that, with one exception not relevant here, "all actions taken by the Register of Copyrights under [Title 17] are subject to the provisions of the Administrative Procedure Act." 17 U.S.C. § 701(e). We have previously reviewed actions of the Register based on this provision. *See, e.g.*, *Atari Games Corp. v. Oman*, 888 F.2d 878, 879 & n.1 (D.C. Cir. 1989); *Universal City Studios LLLP v. Peters*, 402 F.3d 1238, 1242 (D.C. Cir. 2005). Although section 701(e) refers to actions of the Register, the Register is subordinate to the Librarian and "shall act under the Librarian's … direction and supervision." 17 U.S.C. § 701(a). More specifically, "[a]ll regulations established by the Register under [Title 17] are subject to the approval of the Librarian of Congress." *Id.* § 702. In short, Congress provided that the Register may establish copyright regulations, with the approval of the Librarian, and that such regulations are subject to the APA and are judicially reviewable.

---

[1] Similarly, Congress may withdraw agency action from APA review that would otherwise be subject to it. *See, e.g.*, *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (recognizing Congress had exempted certain functions of the Department of Commerce from the APA's judicial review provisions).

Congress conferred authority for the triennial rules at issue here in the DMCA, which added the following provision to Title 17: "[T]he Librarian of Congress, upon the recommendation of the Register of Copyrights, … shall make the determination in a rulemaking proceeding" whether to waive the anti-circumvention provision for certain classes of copyrighted works. *Id.* § 1201(a)(1)(C). In other words, the DMCA authorized a new type of copyright regulation that would be formulated by the Register and approved by the Librarian.

Reading the two statutes as a comprehensive statutory scheme, DMCA rules are also subject to the APA under 17 U.S.C. § 701(e). The Copyright Act plainly applies the APA to "all actions" of the Register under Title 17, including rulemaking subject to the approval of the Librarian. *See id.* §§ 701(e), 702. DMCA rules are also actions of the Register under Title 17 that, like the Register's other regulations, require the approval of the Librarian.

Because the DMCA and the Copyright Act address the rulemaking authority of the Register and Librarian, the two statutes are *in pari materia* and should be construed "as if they were one law." *United States v. Freeman*, 44 U.S. (3 How.) 556, 564 (1845). "[I]t is … the most rudimentary rule of statutory construction … that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes." *Branch v. Smith*, 538 U.S. 254, 281 (2003) (plurality opinion). The DMCA establishes new rulemaking authority within Title 17,

supplementing the regulatory scheme established by the Copyright Act.[2]

Although the Copyright Act emphasizes the Register's role in rulemaking and the DMCA focuses on the Librarian's, the assignment of regulatory authority is identical. The DMCA gives rulemaking authority to the Librarian, who explicitly acts upon the recommendation of the Register. 17 U.S.C. § 1201(a)(1)(C). This parallels the Copyright Act, which requires the Librarian to approve all copyright regulations developed by the Register. *See id.* § 702. Both statutes require the Register to initiate or propose copyright rules and the Librarian to approve them.[3] Thus, although the DMCA is silent with respect to judicial review, the review provision of the Copyright Act, codified at 17 U.S.C. § 701(e), applies with equal force to DMCA rules.

Because triennial DMCA rules are subject to the APA, sovereign immunity poses no barrier to the trade associations' suit. Waivers of the United States' sovereign immunity must be "unequivocally expressed." *United States v. Nordic Vill.*

---

[2] The *in pari materia* canon reflects the basic principle that courts should read related bodies of law as a consistent and coherent whole. The canon has been invoked in a variety of contexts, including when a later statute amends a prior enactment or when different provisions of a statutory scheme address a similar topic. *See, e.g.*, *United States v. Jenkins*, 50 F.4th 1185, 1207 (D.C. Cir. 2022) (explaining that an act amending a prior statute "should be read *in pari materia*" with the section it amended); *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 638 (2009) (interpreting two subsections within the same statutory section *in pari materia*).

[3] As a practical matter, the Library explains the triennial rules are developed like other copyright regulations with the Register conducting "most aspects of the rulemaking" and the Librarian providing the final approval.

*Inc.*, 503 U.S. 30, 33 (1992) (cleaned up). But there is no dispute that the APA unambiguously waives sovereign immunity for non-monetary claims. 5 U.S.C. § 702. It is true that, by its terms, the APA's waiver of sovereign immunity applies to "agenc[ies]" and the "officer[s] … thereof." *Id.* But regardless of whether the Library is an "agency" under the APA, Congress has plainly applied the APA's waiver of sovereign immunity to the actions of the Register and Librarian at issue here. Sections 701(e) and 702 of Title 17 expressly bring copyright rules promulgated by the Register and approved by the Librarian within the ambit of the APA. DMCA rules are promulgated by the Register and approved by the Librarian, and thus the APA's waiver of sovereign immunity applies to the trade associations' suit against the Library and Librarian.

## B.

Recognizing that the APA applies to the triennial rules is the most coherent interpretation of the scheme of copyright regulation established by Congress in the Copyright Act and the DMCA. Moreover, this interpretation comports with longstanding background principles of judicial review.

When Congress authorizes agencies to regulate or to administer the law subject to specific legal requirements, such executive action is ordinarily subject to judicial review. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967). "[T]he power of … agencies is circumscribed by the authority granted," and courts have the responsibility to determine whether "individual rights" have been infringed "by the exertion of unauthorized administrative power." *Stark v. Wickard*, 321 U.S. 288, 309–10 (1944). Agencies must operate within the legal authority conferred by Congress, and when

those limits are transgressed, an individual may seek recourse in the Article III courts.

This tradition of judicial review follows from the Constitution's structure of separated powers and long predates the APA. As Chief Justice Marshall recognized, "[t]he very essence of civil liberty … consists in the right of every individual to claim the protection of the laws." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). He later wrote that "in a government of laws and of principle," when an official takes an action against private rights, the affected individual should generally have an "appeal to the laws of his country." *United States v. Nourse*, 34 U.S. (9 Pet.) 8, 28–29 (1835). In the words of one leading scholar: "[T]here is in our society a profound, tradition-taught reliance on the courts as the ultimate guardian and assurance of the limits set upon executive power by the constitutions and legislatures." LOUIS L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 321 (1965). After all, "[a]n agency is not an island entire of itself. … The very subordination of the agency to judicial jurisdiction is intended to proclaim the premise that each agency is to be brought into harmony with the totality of the law." *Id.* at 327.

Congress's "historic practice" of providing for judicial review of administrative action reflects the importance of an independent check on the exercise of executive power. *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–73 (1986). Of course, Congress may, subject to constitutional limitations, withhold judicial review. *Id.* at 672–73; *cf. Patchak v. Zinke*, 138 S. Ct. 897, 906 (2018) (recognizing Congress's power to "strip[] federal jurisdiction over a class of cases"). But absent such a legislative decision, courts have the power and the duty to review agency action for conformity with the law.

Reading section 701(e) to provide for judicial review of triennial DMCA rules aligns with fundamental principles regarding the protection of individual rights against unlawful government action. To begin with, the Copyright Act and the DMCA give the Register and Librarian significant authority to "promulgate copyright regulations" and "apply the statute to affected parties." *See Intercollegiate Broad.*, 684 F.3d at 1342. As we have recognized, and no party disputes, these powers are "generally associated in modern times with executive agencies." *Id.* When enacting regulations and enforcing the law, "the Library is undoubtedly a component of the Executive Branch." *Id.* (cleaned up). Moreover, the triennial rules directly affect valuable property rights, such as a copyright holder's ability to limit access to a digital creation and to prevent intellectual property theft. The triennial rules also provide exemptions from civil and criminal liability that would otherwise attach to individuals who circumvent technological protective measures. 17 U.S.C. §§ 1201(a)(1)(B), 1203–04. The exemptions are not left solely to the Librarian's discretion, but instead must be determined according to specific statutory criteria. *Id.* § 1201(a)(1)(C). There is no indication in the DMCA that Congress, having allocated this substantial regulatory power to the Librarian and Register and identified the legal criteria they must apply, would leave such power unchecked by judicial review.

These background principles about the role of judicial review accord with our interpretation of the Copyright Act and the DMCA that the triennial rules, like other copyright regulations, are subject to the APA and are judicially reviewable.

C.

The Library raises a series of arguments for why judicial review is barred, but none addresses the essential connection between the Copyright Act and the DMCA. Nor does the Library seriously grapple with 17 U.S.C. § 701(e), which subjects all actions of the Register, including rules approved by the Librarian, to the APA.

First and foremost, the Library insists it is a component of "the Congress" and therefore not an "agency" for purposes of the APA's waiver of sovereign immunity. But the precedents on which the Library relies considered only whether the APA was applicable by its own terms. *See Clark*, 750 F.2d at 102; *Ethnic Emps.*, 751 F.2d at 1416 n.15; *Wash. Legal Found.*, 17 F.3d at 1449. None of these cases involved an action of the Register or Librarian under Title 17, and so there was no reason to consider the application of section 701(e). In *Clark*, for instance, a plaintiff brought constitutional and employment discrimination claims against the Library, alleging that the Library improperly investigated and refused to hire him because of his political beliefs and associations. *See* 750 F.2d at 92. In that context, we explained the APA's waiver of sovereign immunity did not apply to the Library because it was not an APA "agency." *Id.* at 102. In *Ethnic Employees*, we similarly found that an employee organization could not assert an APA claim against the Library because the Library "is not an agency under the [APA]." 751 F.2d at 1407, 1416 n.15. And *Washington Legal Foundation* merely summarizes the holding of *Ethnic Employees* in dictum. *See* 17 F.3d at 1449.

Even if these cases generally classify the Library as a component of "the Congress" under the APA, Congress may

still apply the APA to particular actions of the Librarian and Register by statute.[4] It did precisely that in 17 U.S.C. § 701(e).[5]

Second, the Library relies upon the fact that the Librarian has been authorized to "make rules and regulations for the government of the Library" for over a century, yet she has never followed the APA's procedures when making such rules. Act of Feb. 19, 1897, ch. 265, 29 Stat. 538, 544 (now codified at 2 U.S.C. § 136). The cited rulemaking authority, however, pertains only to the internal management of the Library, and such rules are generally exempt from the APA's procedural requirements for informal rulemaking. *See* 5 U.S.C. § 553(a)(2). Thus, the Librarian's alleged disregard of the APA for such rules tells us nothing about the applicability of the APA to copyright regulations promulgated under Title 17. In any event, we conclude only that triennial DMCA rules are subject to the APA under section 701(e); we have no occasion to consider whether the APA applies to the Librarian's other statutory responsibilities.

Third, the Library raises a series of statutory arguments for why the APA's waiver of sovereign immunity does not allow for a suit challenging the triennial rules. The Library maintains that applying the APA to the Library and its officers would

---

[4] Furthermore, we have recently recognized the important executive power exercised by the Library, suggesting that whatever the Library's historical association with Congress, it is squarely a component of the Executive Branch in its role as a copyright regulator. *Intercollegiate Broad.*, 684 F.3d at 1341–42.

[5] Because we understand section 701(e) to provide for judicial review of DMCA rules, we need not address the trade associations' novel theory that the Library is an APA agency and subject to judicial review when it takes on an "executive 'rulemaking' role" but not an APA agency when it does not.

render section 701(e) superfluous. There would have been no need for Congress to authorize judicial review in the Copyright Act if the APA's judicial review provisions already applied. But in light of our caselaw, we need not, and do not, reach the question of whether the Library is an "agency" within the meaning of the APA. Instead, we recognize that, regardless of whether the Library is an APA "agency," section 701(e) applies the APA to "all actions" of the Register under Title 17, including regulations approved by the Librarian.

The Library and the dissent also contend that triennial rules are actions of the Librarian, not the Register, and so section 701(e) simply does not apply. Relying on the presumption against waivers of sovereign immunity, the dissent suggests that section 701(e) cannot authorize suits against the Librarian because it mentions only the Register by name. Dissenting Op. 1–3. But "the sovereign immunity canon is a tool for interpreting the law and … does not displace the other traditional tools of statutory construction." *FAA v. Cooper*, 566 U.S. 284, 291 (2012) (cleaned up). Thus, "we … require … that the scope of Congress' waiver be clearly discernable from the statutory text in light of traditional interpretive tools." *Id.* As we have already explained in detail, the statutory text, context, the *in pari materia* canon, and background principles all confirm that—by making copyright regulations reviewable—Congress applied the APA's clear waiver of sovereign immunity to both the Register and Librarian when they issue such rules.

Relatedly, the Library stresses that the Register's participation in triennial rulemaking is not reviewable agency action because her recommendation is not "final"—it must be approved by the Librarian. On the Library's view, section 701(e) applies only to actions of the Register that require no further approval. But this argument proves too much because

the Register has no final rulemaking authority. 17 U.S.C. § 702. Under the Library's rationale, *no* copyright regulations would be judicially reviewable. Such a startling result would eviscerate Congress's clear directives, which subject "all actions" of the Register under Title 17 to the APA and require the Librarian to approve the Register's regulations.[6]

In sum, none of the Library's counterarguments undermine our conclusion that the text and structure of the DMCA and the Copyright Act provide for APA review of triennial DMCA rules.

\* \* \*

Congress provided that the APA applies to copyright rules under Title 17, which includes the triennial DMCA rule challenged here. This conclusion accords with the background principle favoring judicial review of administrative action and harmonizes the scheme of copyright regulation and judicial review established by the Copyright Act and the DMCA. We interpret the statutes "as a symmetrical and coherent regulatory scheme," "reconciling many laws enacted over time, and getting them to 'make sense' in combination." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 143 (2000) (cleaned up).

---

[6] We similarly reject the Library's other attempts to fracture the legislative scheme for copyright regulation. For instance, the Library maintains the Librarian's finalization should not be subject to the APA, but it concedes the APA must apply to those parts of the triennial rulemaking conducted by the Register. We are not aware of any regulatory scheme adopting such a piecemeal application of the APA to the process for promulgating rules of general applicability.

The trade associations may challenge the triennial rule under the APA.[7] We vacate the judgment and remand for the district court to consider the merits of the APA claims in the first instance.

*So ordered.*

---

[7] The district court rejected the trade associations' *ultra vires* claim on the merits. Because we hold that Congress has provided for APA review of DMCA rules, the *ultra vires* claim is no longer available, and we need not address it. *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (explaining an *ultra vires* claim can proceed only when a statute impliedly precludes judicial review and "no alternative procedure for review of the statutory claim" exists) (cleaned up).

CHILDS, *Circuit Judge*, dissenting:

The United States is immune from suit absent express consent to be sued. *United States v. Sherwood*, 312 U.S. 584, 586 (1941); *FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text."). Any ambiguities must be "construed in favor of immunity." *FAA*, 566 U.S. at 290-91.

While I agree that under 17 U.S.C. § 701(e), the Copyright Act expressly provides that "all actions" of the Register of Copyrights under Title 17 are "subject to the provisions of the [APA]," I disagree with the majority's conclusion that such language can be expanded to constitute a waiver of sovereign immunity for the Library of Congress or the Librarian. Neither the text of the Administrative Procedure Act ("APA"), the Copyright Act of 1976, nor the Digital Millennium Copyright Act ("DMCA") meet the requisite threshold showing that Congress provided "clear or express consent" for either entity to be sued. *See Sherwood*, 312 U.S. at 586. I would instead affirm the district court's holding that the trade associations' claims are barred by sovereign immunity and that they failed to plead a proper ultra vires claim.

One might argue that an express waiver is found in the APA, which provides for judicial review of final agency actions, but such an argument is barred by our Circuit's precedent holding that the Library of Congress is not an "agency" under the APA.[1] *See Clark v. Libr. of Cong.*, 750

---

[1]*See* 5 U.S.C. § 551 ("For the purpose of this subchapter — (1) 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency but does not include — (A) the Congress."). The Library of Congress is part of "the Congress" and therefore is not an agency within the meaning of the APA.

F.2d 89, 102-03 (D.C. Cir. 1984); *Ethnic Emps. of Libr. of Cong. v. Boorstin*, 751 F.2d 1405, 1416 n.15 (D.C. Cir. 1985); *Wash. Legal Found. v. U.S. Sent'g Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994) (noting that Congress clearly subjected the Sentencing Commission to the APA's notice and comment provisions in the Sentencing Reform Act of 1984). Thus, to exercise judicial review over the Librarian, we must rely on another express statutory provision subjecting the Librarian to the APA or otherwise waiving sovereign immunity over the Librarian's actions. Congress has at times subjected non-agencies, such as the Sentencing Commission, to APA review. *See supra* note 1. But Congress has not expressly provided for APA review of the Librarian.

There is no statutory provision expressly waiving sovereign immunity over the Librarian or subjecting the Librarian to the APA, and, in my view, the majority's attempt to infer such a waiver by analogy to the Copyright Act violates longstanding principles of statutory interpretation that a waiver of sovereign immunity "must be construed strictly in favor of the sovereign" and "not enlarge[d]…beyond what the language requires." *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34 (1992) (internal quotation marks omitted).

Moreover, even without the strong presumption against implied waivers of sovereign immunity, the majority's *in pari materia* argument is unsupported by "traditional interpretive tools," *supra* note 19, for two reasons.

First, the *in pari materia* canon applies when the Court is interpreting ambiguous statutory language—not statutory silence. *Cf. EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) ("The problem with this approach is the

one that inheres in most incorrect interpretations of statutes: It asks us to add words to the law to produce what is thought to be a desirable result. That is Congress's province. We construe [a statute's] silence as exactly that: silence."); *United Shoe Workers of Am., AFL-CIO v. Bedell*, 506 F.2d 174, 189 n.96 (D.C. Cir. 1974) ("A statute is not *in pari materia* if its scope and aim are distinct or where a legislative design to depart from the general purpose or policy of previous enactments may be apparent") (cleaned up); 73 Am. Jur. 2d Statutes § 87 ("However, the *in pari materia* rule of statutory construction, requiring statutes which relate to the same subject matter to be read and applied together, applies only when a statute is ambiguous."). Congress could have unequivocally subjected the Librarian to the APA, in the DMCA, like it did in the Copyright Act of 1976 for the Register of Copyrights. *See* 17 U.S.C. § 701. The DMCA was enacted in 1998, twenty-two years after the Copyright Act. The DMCA's silence with respect to judicial review does not create ambiguity.

Second, even accepting *arguendo* the majority's argument that the Registrar's recommendations to the Librarian should be subject to judicial review under the Copyright Act, that argument still falls short of showing that the Court can exercise review over the Librarian—the actual defendant in this lawsuit.

There are good reasons not to treat the Registrar's regulations, subject to the Librarian's approval, identically to mere recommendations that the Register provides to the Librarian to assist the Librarian in carrying out its statutory obligations to the DMCA. *See* 17 U.S.C. § 1201. Under the DMCA, decision-making authority is vested in the Librarian who is directed to consider § 1201's expressly enumerated factors but is also given discretion to consider any factor the

Librarian deems appropriate. *Id.* The fact that there is little statutory information about what the Register must consider in its recommendation further supports the position that it is unlikely that Congress intended for judicial review of the Librarian's triennial rulemaking. Under this statutory scheme, the recommendations are mere suggestions and one of many factors and considerations that the Librarian can utilize to make its decision. *See* § 1201(c). By contrast, under 17 U.S.C. § 702, "[a]ll regulations established by the Register under this title are subject to the approval of the Librarian of Congress." *Id.* But the statutory authority to promulgate those regulations lies with the Registrar. Moreover, while the Librarian has authority to approve (or reject) the Registrar's regulations, the statute is silent as to whether the Librarian could substantively rewrite the regulations and promulgate the rewritten versions.

Because the Library of Congress is not an agency within the meaning of the APA and Congress has not otherwise expressly waived sovereign immunity over suits challenging the Librarian's actions, I would affirm the district court's holding that the trade associations' claims are barred by sovereign immunity.